IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAMES BYRON COON,

        Petitioner,

   v.

MARK NOOTH,

        Respondent.

Case No. 2:15-cv-02125-MO

OPINION AND ORDER

Oliver W. Loewy
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

     Attorney for Petitioner

Ellen F. Rosenblum, Attorney General
Kristen E. Boyd, Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97310

     Attorneys for Respondent

MOSMAN, District Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his state-court convictions for Murder and Tempering with a Witness. For the reasons that follow, the Corrected Amended Petition for Writ of Habeas Corpus (#47) is denied.

## BACKGROUND

Petitioner had a history of violent relationships with women. In January 2001, he assaulted his girlfriend, Patty Flynn, resulting in his arrest. The following month, he was out at a tavern with Flynn when he hit her in the jaw. Respondent's Exhibit 108, p. 6. Flynn took a taxi to her mother's house where Flynn visited with her five-year-old son. Petitioner arrived sometime thereafter, and the mother told him to leave. Flynn's mother, son, and Flynn's mother's neighbor all witnessed Petitioner threaten Flynn, telling her that he was going to kill her. *Id* at 7. The neighbor called the police, prompting Petitioner to leave the area, and Flynn refused to talk to the officers who arrived on the scene.

After the officers departed, Flynn left her mother's home claiming that she needed cigarettes, but she took a taxi to Petitioner's home. Shortly thereafter, Flynn was dead. Petitioner called his sister, Jerrie, asking for help with a "problem" he had. Jerrie thought Petitioner sounded suicidal and asked police to conduct a welfare check.

Petitioner called his friend, Maggie, and told her "he had to get out of there because he was going to jail, and that he

2 – OPINION AND ORDER

wanted to kill himself. . . ." Respondent's Exhibit 201, p. 20.
Maggie went over to Petitioner's home where he grabbed her by
both forearms and told her, "Don't look. Don't look. Flynn is
dead on the bed." *Id* at 23. Maggie responded, "Damn you Jim. You
brought me into the middle of a murder scene." *Id* at 24.
Petitioner apologized to her, and "just kept saying he was sorry.
He didn't mean to do it. It was an accident." *Id*. He told Maggie
that he needed to "dump" the body somewhere. When Maggie told him
that they should call the police, Petitioner said he needed more
time and indicated that he needed to leave town. *Id* at 24-25.

Petitioner told Maggie that he had smothered or suffocated
Flynn, and that it had been his intention to scare her and that
he hadn't meant to kill her. *Id* at 32. Maggie drove Petitioner to
the home of friends named Penny and Kenneth, who drove Petitioner
to another friend's home. During the drive with Penny and
Kenneth, Petitioner told them, "I don't know if you guys know how
serious this is . . . but I killed Flynn last night." *Id* at 94.
Kenneth told him not to say anything more, and Petitioner
responded that he had smothered her with a pillow, and that it
had been an accident. *Id*. Kenneth once again told Petitioner not
to say anything more.

When authorities showed up at Petitioner's house to conduct
the welfare check Jerrie requested, they found Flynn's body. In
the meantime, Petitioner had decided to leave Central Oregon,
boarded a Greyhound bus bound for Portland, and shaved off his
mustache to change his appearance along the way. Respondent's

Exhibit 108, p. 16. Law enforcement arrested Petitioner upon his arrival in Portland.

The Deschutes County Grand Jury indicted Petitioner on three counts of Aggravated Murder, one felony count of Tampering with a Witness, and one misdemeanor count of Assault. Respondent's Exhibit 104. The State posited three theories underlying the Aggravated Murder charges: (1) Petitioner had previously been convicted of Manslaughter in the First Degree in California when he shot a man in the back; (2) Flynn was a witness against Petitioner for the pending assault from January 2001; and (3) Petitioner caused Flynn's death while torturing her. The State was confident it "had ample evidence to support every one of those theories in this case" and noted that "as time went by from the date of this incident in February, the state's case actually became stronger in a number of areas." Respondent's Exhibit 108, p. 13.

The Deschutes County Circuit Court appointed Dennis Hachler and Geoffrey Gokey to represent Petitioner. On October 4, 2001, the trial court conducted a settlement conference where the State offered him a reduced sentence in exchange for a plea to Murder. The settlement conference was highly charged, and according to Petitioner's Declaration that he submitted during his post-conviction relief ("PCR") proceedings, the Judge who presided over the settlement conference indicated he would not hesitate to sign Petitioner's death warrant if it came across his desk. Respondent's Exhibit 124, p. 22. Petitioner also declared that Hachler told him to

4 - OPINION AND ORDER

> quit my damn crying. Then he yelled, "What the hell is wrong with you! They're giving you your last chance! You don't even have to admit any guilt—you can just plead Alford pleas!" He walked over to where I was seated and stopped. Looking down at me with an angry stare, Hachler yelled, "Don't make us help them kill you! Take the damned deal!"

*Id* at 27.

The State's offer called for Petitioner to enter an *Alford* plea to one count of Murder and one count of Tampering with a Witness and waive his right to appeal. In exchange, the State removed the Aggravated Murder charges and stipulated to a sentence of: (1) 300 months imprisonment and 36 months of post-prison supervision on the Murder conviction; and (2) a consecutive upward departure sentence of 60 months on the Tampering conviction, with 24 months supervision to be served concurrently with that of the Murder term. Respondent's Exhibit 106. This represented a particularly positive outcome for Petitioner where he not only escaped the capital nature of an Aggravated Murder trial, but also negotiated a sentence that was less than the statutorily-required life sentence with a 300-month minimum for Murder. *See* ORS 163.115(5).

Petitioner entered his plea the day of the settlement conference, and sentencing was scheduled to occur three weeks later. Very shortly after entering his plea, Petitioner contacted his attorneys and informed them he was dissatisfied with his plea because he had been unduly pressured to accept it. He asked counsel to file a motion to withdraw the plea. Respondent's Exhibit 213, p. 71. Petitioner indicated he might represent

himself, but Gokey told him that he would try to locate separate counsel, and reiterated that he felt that the plea was still in Petitioner's best interests. *Id* at 72. Gokey contacted the Oregon State Bar the following day, concerned about a potential conflict with his client. He and Hachler then decided to get another attorney to come in and talk with Petitioner:

> Well, I didn't know anybody. Mr. Hachler knew Mark Rader and I'd heard of Mark Rader, and so Mr. Hachler contacted Mark Rader and then contacted the powers to be at that time, the State Court Administrator's office . . . about getting somebody over there. And that lawyer, he came over and me (sic) a copy of the file for him. I think I even gave him some of our original materials and he went to meet the client. I'm not sure if I met with Mr. Coon again. I don't think I did.

*Id* at 74-75.

According to Rader, Hachler contacted him and "said that [Petitioner] was a very troublesome client. He wants me to review the discovery and meet with Mr. Coon to discuss his case and attempt to get him back in line so he'll go through with sentencing now scheduled for 10/25." Respondent's Exhibit 143, p. 1. Rader, in turn, successfully sought authorization for a particular investigator who, as Rader put it, "very often has a way with these guys so maybe between the two of us we can talk Coon into staying with the deal." *Id.*

None of the attorneys involved with Petitioner's case moved to withdraw the plea, and the case proceeded to sentencing. Gokey and Hachler accompanied Petitioner to his sentencing, but did not

represent him during that proceeding. The sentencing Judge personally told Gokey in chambers that he was

> upset about the settlement conference and he was upset about the process; and he said he thought maybe it was unethical. And this was in chambers with the District Attorney sitting there, and the District Attorney said we want to stick with this judge or something like that. He said, well, if he wants out of this he's getting out of this; and that was in chambers to us. And . . . then I sat and watched him, my recollection is five times he asked Mr. Coon if he wanted to withdraw his plea and he said, no, he's fine. That's with Mr. Rader.

Respondent's Exhibit 213, pp. 86-87.

When sentencing commenced, Rader represented Petitioner while Gokey and Hachler sat inside the courtroom and observed the proceedings. *Id* at 86. At the court's request, Rader stated on the record how he had come to represent Petitioner at sentencing. Rader informed the court that Petitioner wished to go forward with the plea and sentencing. Respondent's Exhibit 108, p. 23. The sentencing judge twice more inquired as to Petitioner's willingness to proceed:

> Court: I just want to make sure that your client is prepared to go forward today without any hesitation, he still is comfortable with the plea agreement he entered into.
>
> Rader: Your Honor, Mr. Coon just explained to me that he is comfortable going forward with it.
>
> \* \* \* \* \*
>
> Court: And he does not wish to file a motion to withdraw his plea?

Rader:    No, Your Honor, he does not.

Court:    All right, let's go ahead.

*Id* at 24-25.

The judge proceeded to sentence Petitioner in accordance with the plea deal to 300 months in prison and 36 months of post-prison supervision on the Murder conviction, and 60 consecutive months in prison on the Witness Tampering conviction with a concurrent 24-month term of post-prison supervision. The Judgment the court issued erroneously stated that Petitioner was guilty of Aggravated Murder instead of Murder, and in February 2002 the State moved to amend the judgment to correct the error. The State also asked the court to increase the term of post-prison supervision from 36 months to life. It appears the trial court granted the Motion, but did not enter an amended judgment.

Seven years later, Petitioner took a direct appeal but the Oregon Court of Appeals dismissed the case for lack of jurisdiction, and the Oregon Supreme Court denied review. Respondent's Exhibits 110, 113.

Petitioner next filed for collateral relief in Malheur County where the PCR court dismissed the action based upon Petitioner's prior waiver of his right to appeal. Respondent's Exhibit 119. Petitioner appealed, and the parties jointly moved to remand the case to the PCR court for a determination as to whether he properly waived his right to pursue his PCR remedy. The PCR court found he did not enter a valid waiver, especially where he executed the waiver well before Rader entered the case:

> Petitioner was represented by two attorneys
> through the time of plea. Immediately after
> the plea, petitioner told them he had changed
> his mind and wanted to withdraw his plea and
> go to trial. Mr. Rader appeared as his
> attorney at sentencing. He was never
> appointed, the plea attorneys never withdrew,
> Rader was requested by the plea attorneys to
> try to convince petitioner to continue with
> the deal. There is no evidence that
> petitioner requested to speak to another
> attorney or had ever heard of Mr. Rader.

\* \* \* \* \*

> Mr. Rader was contacted by the plea attorneys
> to convince petitioner to continue with the
> deal. He was not there as an independent
> advisor concerning the waiver. Petitioner had
> no advi[c]e from a disinterested lawyer about
> what he was giving up. This is not to fault
> the plea attorneys who the court assumes felt
> they had done a great job in representing
> petitioner, and that he was not really giving
> up anything. This court is determining only
> whether the waiver is valid, not whether
> there are grounds for post conviction relief.

Respondent's Exhibit 182, pp. 1-2.

The PCR court later conducted a lengthy evidentiary hearing on the merits of Petitioner's claims and ultimately concluded that the plea was not coerced, that his attorneys were not ineffective, and that Petitioner had not established prejudice. Respondent's Exhibit 217. The PCR court did, however, require that an amended judgment be filed setting forth the proper convictions and sentence to reflect the terms Petitioner had negotiated in his plea deal, including deletion of the post-prison supervision term on the Tampering count to ensure that it did not exceed the statutory maximum sentence.[1] *Id* at 3;

---

[1] The two years of post-prison supervision initially imposed on the Tampering conviction was run concurrently to the three years of supervision on the

Respondent's Exhibits 227 & 228. The Oregon Court of Appeals affirmed this decision without issuing a written opinion, and the Oregon Supreme Court denied review. Respondent's Exhibits 125 & 126.

Petitioner filed his Corrected Amended Petition for Writ of Habeas Corpus in this case on July 11, 2017 raising eight grounds for relief:

> 1.  Petitioner's trial attorneys rendered ineffective assistance when they failed to: (a) investigate asthma as the cause of the victim's death; (b) conduct an adequate mitigation investigation; (c) alert the trial court that a conflict of interest had arisen when they coerced his guilty plea; and (d) advise Petitioner that the stipulated sentence on the Witness Tampering charge was unlawful because there was no stipulation to the facts necessary for the upward departure sentence, and the agreed-upon sentence on the Murder charge was less than the statutory requirements.
>
> 2.  Petitioner's *Alford* plea was not voluntary, knowing, and intelligent;
>
> 3.  The trial court violated Petitioner's right to due process when it amended his sentence to increase his term of post-prison supervision, breaching his plea agreement;
>
> 4.  The State violated Petitioner's right to due process when it made an intentional sentencing misrepresentation to include his plea;
>
> 5.  The upward departure sentence on the Witness Tampering conviction violated Petitioner's Sixth Amendment right to a jury

---

Murder charge, so this change in the Amended Judgment was of no practical effect to Petitioner. But where the statutory maximum on the Tampering charge was 60 months, and that represented Petitioner's prison sentence, the additional 24 months of supervision technically exceeded the statutory maximum.

trial and his Fourteenth Amendment right to
due process;

6.   Petitioner was without counsel at his
sentencing hearing in violation of his Sixth
and Fourteenth Amendment rights to counsel
and due process

7.   Petitioner's conviction and sentence
violate the Eighth and Fourteenth Amendments
because he is actually innocent of Murder;
and

8.   The cumulative effect of the foregoing
errors mandate that Petitioner's convictions
and sentences be vacated.

Corrected Amended Petition (#47).

Respondent asks the Court to deny habeas corpus relief
because: (1) Petitioner failed to fairly present Grounds Two,
Three, Four, Five, Six, and Eight to Oregon's state courts,
leaving them procedurally defaulted; (2) the PCR court's decision
as to the claims in Ground One was neither contrary to, nor an
unreasonable application of clearly established federal law; and
(3) Petitioner cannot meet his burden to establish his
freestanding claim of actual innocence in Ground Seven.

### DISCUSSION

## I.   Exhaustion and Procedural Default

A habeas petitioner must exhaust his claims by fairly
presenting them to the state's highest court, either through a
direct appeal or collateral proceedings, before a federal court
will consider the merits of those claims. *Rose v. Lundy*, 455 U.S.
509, 519 (1982). "As a general rule, a petitioner satisfies the
exhaustion requirement by fairly presenting the federal claim to
the appropriate state courts . . . in the manner required by the

state courts, thereby 'affording the state courts a meaningful opportunity to consider allegations of legal error.'" *Casey v. Moore,* 386 F.3d 896, 915-916 (9th Cir. 2004) (quoting *Vasquez v. Hillery,* 474 U.S. 254, 257, (1986)). If a habeas litigant failed to present his claims to the state courts in a procedural context in which the merits of the claims were actually considered, the claims have not been fairly presented to the state courts and are therefore not eligible for federal habeas corpus review. *Edwards v. Carpenter,* 529 U.S. 446, 453 (2000); *Castille v. Peoples,* 489 U.S. 346, 351 (1989).

A petitioner is deemed to have "procedurally defaulted" his claim if he failed to comply with a state procedural rule, or failed to raise the claim at the state level at all. *Carpenter,* 529 U.S. 446, 451 (2000); *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). If a petitioner has procedurally defaulted a claim in state court, a federal court will not review the claim unless the petitioner shows "cause and prejudice" for the failure to present the constitutional issue to the state court, or makes a colorable showing of actual innocence. *Gray v. Netherland,* 518 U.S. 152, 162 (1996); *Sawyer v. Whitley,* 505 U.S. 333, 337 (1992); *Murray v. Carrier,* 477 U.S. 478, 485 (1986).

Petitioner did not fairly present any federal claims to Oregon's state courts during direct review where he failed to timely file his direct appeal, and the Oregon Court of Appeals dismissed the action for lack of jurisdiction. During his PCR appeal, Petitioner argued that his plea was not voluntary because his attorneys coerced him to enter the plea and failed to

properly advise him. Respondent's Exhibit 218. These claims correspond to Ground One of the Corrected Amended Petition for Writ of Habeas Corpus. Although Petitioner also filed a supplemental *pro se* brief during his PCR appeal, with the exception of his Ground Eight cumulative error claim, the *pro se* briefing did not preserve any additional claims for this Court's review.[2] Accordingly, Grounds Two, Three, Four, Five, and Six are procedurally defaulted. Although petitioner argues that ineffective assistance of counsel excuses his default, for the reasons discussed below Petitioner was not the victim of ineffective assistance of counsel in this case.[3]

///

///

///

---

[2] Petitioner's first *pro se* claim asserted that his sentence was illegal, but he could have pursued the claim on direct appeal such that state law foreclosed him from arguing it as a PCR claim. *Palmer v. State*, 318 Or. 352, 354 (1994). His second *pro se* claim mirrored arguments his attorneys had already made on his behalf. Respondent's Exhibits 218, 219. Petitioner's third claim, like his first claim, challenged his allegedly improper sentences (barred by *Palmer*). To the extent he wished his third *pro se* claim to encompass additional claims of trial court error, such claims were unpreserved where he did not present any other claims of trial court error to the PCR court. In the Oregon Supreme Court, Petitioner did not pursue his fourth *pro se* appellate claim that prosecutors breached the plea agreement by seeking to increase his term of post-prison supervision (the PCR court had already resolved this issue in his favor), leaving it procedurally defaulted. Respondent's Exhibit 223. Finally, Petitioner's fifth *pro se* claim involving actual innocence corresponds to Ground Seven in this habeas action, which Respondent concedes is not precluded by a procedural default in state court. The fifth claim also raises a claim of cumulative error, which this Court will address on its merits as Ground Eight.

[3] Petitioner argues as to Ground Three that a fourth attorney, Rankin Johnson, failed to timely object to the issuance of the Amended Judgment. Where it does not appear that Mr. Johnson represented Petitioner during his initial-level PCR proceedings, *Martinez v. Ryan,* 566 U.S. 1 (2012) cannot serve to excuse the default. Respondent's exhibit 213, p. 10 (listing initial-level PCR attorneys). In any event, where the Amended Judgment reflects the sentence Petitioner bargained for, Petitioner suffered no prejudice from any attorney error.

## II. **The Merits**

### A. **Standard of Review**

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410. Twenty-eight U.S.C. § 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with

[the Supreme] Court's precedents. It goes no farther."
*Harrington v. Richter*, 562 U.S. 86, 102 (2011).

By contrast, 28 U.S.C. § 2254(d)(2) allows a petitioner to "challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). A federal habeas court cannot overturn a state court decision on factual grounds "unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). This is a "'daunting standard—one that will be satisfied in relatively few cases,' especially because we must be 'particularly deferential to our state-court colleagues.'" *Hernandez v. Holland*, 750 F.3d 843, 857 (9th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)).

**B.** **Analysis**

1.  Grounds One and Eight: Ineffective Assistance of Trial Counsel

The Court uses the general two-part test established by the Supreme Court to determine whether Petitioner received ineffective assistance of counsel. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009). First, Petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the

conduct falls within the "wide range of reasonable professional assistance." *Id* at 689.

Second, Petitioner must show that his counsel's performance prejudiced the defense. The appropriate test for prejudice is whether Petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. In proving prejudice, a petitioner who has pled guilty or no contest to an offense must demonstrate that there is a reasonable probability that, but for counsel's errors, he would not have entered such a plea and would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). When *Strickland's* general standard is combined with the standard of review governing 28 U.S.C. § 2254 habeas corpus cases, the result is a "doubly deferential judicial review." *Mirzayance*, 556 U.S. at 122.

Petitioner argues that his trial attorneys should have consulted with an independent forensic pathologist to determine whether the Medical Examiner's report could have supported a theory that the victim died of asthma.[4] He also faults counsel for not developing compelling mitigation evidence of the tragic events he suffered throughout his life, circumstances he believes might have demonstrated that he likely did not face a death

---

[4] Petitioner asserts that this claim is procedurally defaulted, but the State waived its ability to raise such a defense such that the Court should now review the claim *de novo*. Petitioner alleged during his PCR proceedings that counsel failed to conduct adequate investigation into alternate causes of death, including the victim's asthma condition. Respondent's Exhibit 123, p. 8. Petitioner fairly presented his Ground 1(a) claim and *de novo* review is not appropriate.

sentence and should therefore have proceeded to trial. Petitioner next claims that he and his attorneys were conflicted when he felt they coerced him to take the State's plea offer, and that instead of moving to withdraw his plea as he requested, they handpicked Rader as a successor with an eye toward ensuring Petitioner followed through with his plea deal, not an eye toward independently investigating the case. Finally, Petitioner asserts that his trial attorneys failed to inform him that that the stipulated sentences did not conform to state law, and that the Murder sentence in particular left him vulnerable to a challenge by the State to void the plea agreement at a later date because it fell below the statutory minimum.

The PCR court held a lengthy hearing in this case and made a variety of findings applicable to these claims:

> 3. Hachler and Gokey calling in Rader to give a second opinion was reasonable strategy and a valuable service to client.
>
> * * * * *
>
> 5. First attorneys did consult with an expert, Dr. Brady, concerning alternative causes of death. They also got a psychological eval.
>
> 6. Insufficient evidence that Rader unaware of any pertinent facts necessary to evaluate case.
>
> 7. Sentencing judge indicated he would allow plea to be withdrawn because he was unhappy with the process of scheduling the JSC.
>
> 8. Although Rader's representation was short, he had all discovery and Hachler's file. He and investigator read all the

material, got pet's account of facts and could reasonably advise pet of whether he was at risk of the death penalty and whether plea was in his best interest.

9. There is no denial of counsel here. While Rader working on case, Hachler and Gokey were not actively working on it until Rader gave an independent opinion. All that remained for them to do anyway, if plea remained in effect, was to appear when stipulated sentence imposed. No evidence that they wouldn't have represented pet or filed motion to withdraw if case going to trial. No reason to withdraw until able to see whether Rader's advice able to calm situation.

10. Whether or not Hachler and Gokey withdrew prior to sentencing and whether Rader ever formally appointed are not important. All were qualified to represent pet. Pet Never told the court he didn't want Rader. The plan was that Hachler would bill Rader's time as part of Hachler's bill. The court administrator had agreed to pay.

11. Having heard the testimony of Gokey and Rader, this court finds that Rader acted objectively in advising pet. Despite the intent of Hachler, Rader did not feel bound to agree to the advice of Hachler and Gokey and was prepared to advise pet contrary to Hachler's advise if the situation so warranted.

* * * * *

14. As pet testified, this sentence of 25 years and parole is more certain for him tha[n] life with possible parole after 25 years.

15. All three lawyers believed that the state had sufficient evidence to prove the charges. They all believed that his defense would not prevail, especially since he would have to testify and the jury would know about his prior manslaughter (a fact that a motion in limine might have kept out of the first part of the trial if pet did not testify).

16. Plea was knowing and voluntary. No good choices, but all attorneys advised that death sentence very possible, so deal was a good one. It was an Alford plea because pet didn't agree with the state's evidence.

17. Insufficient evidence that the plea was coerced. Clearly the JSC was very emotional, but this pet had weeks after this to decide whether to continue to sentencing or to . . . withdraw the plea. The offer was only open on the day of the JSC, so the court took it immediately. Rader told him later that the court would allow him to withdraw the plea if he wanted to. Even during the sentencing hearing they had an additional opportunity to discuss it further. Again he decided to proceed to sentencing and give up trial. Rader left it up to pet to decide and pet decided.

18. This was a stip sentence. It was better than the statutory max. The subsequent order proposed by the DA to amend the pps was without notice to pet and without opportunity to be heard and contrary to the plea agreement. It appears that order was never actually signed and filed.

\* \* \* \* \*

20. This court has read all of the exhibits, heard all of the testimony and arguments and finds no inadequacy on the part of any of the three lawyers in any issue pled. There was also no prejudice to pet based on the representation.

Respondent's Exhibit 217, pp. 2-3.

Petitioner contends that Gokey and Hachler failed to advise their forensics expert, Dr. Brady, of the victim's asthma condition thereby preventing him from making an informed tactical decision to enter his *Alford* plea. However, the attorneys did, in fact, ask Dr. Brady to look into alternative causes of death.

This was sufficient to meet the constitutional threshold. Moreover, the fact that the victim suffered from asthma was not material given the particular facts of this case. Petitioner threatened to kill the victim in front of witnesses, confessed to several other individuals that he had smothered her to death later that night, asked for help to "dump" the body, and changed his appearance while hurriedly fleeing town. Thus, even if Dr. Brady had opined that the victim could possibly have died of an asthma attack, the totality of the evidence would have rendered this opinion largely meaningless to a jury.

Moreover, if Petitioner had proceeded to trial, and assuming he successfully avoided a death sentence, his most likely outcome was life imprisonment without the possibility of parole. His best outcome if he proceeded to trial was a conviction for Murder without any of the three aggravating circumstances the State felt it could establish. This would have resulted in a mandatory life sentence with a 25-year minimum and lifetime post-prison supervision. ORS 163.115. Petitioner's attorneys negotiated a much better sentence for him that is, surprisingly, below statutory requirements. Petitioner does not have to rely on a parole board for his release, and his post-prison supervision is only 36 months. Under these circumstances, Petitioner cannot credibly assert that he would have foregone the plea deal and proceeded to a trial where he would have received a harsher

sentence under any scenario this Court can envision.[5] Consequently, he cannot establish prejudice.

For these same reasons, it would have made no difference to the ultimate outcome of this case had Petitioner's attorneys vigorously investigated mitigation evidence that might have lessened his chance of receiving a death sentence, or had they advised him that he was receiving a sentence that was lower than the statutory mandatory minimum. Petitioner's attorneys secured an excellent plea deal for him in a case with no viable defense, and he would not have eschewed the bargain to proceed to a trial where the facts and his criminal history stacked up so poorly against him.

Petitioner claims his attorneys were conflicted due to his wish to withdraw his plea, but the PCR court specifically determined that Rader provided advice that was independent of the wishes of Hachler and Gokey. Petitioner characterizes this as an unreasonable determination of the facts in light of the evidence presented where, as recounted in the Background of this Opinion, Hachler had arranged for Rader's involvement in the case with the express purpose of convincing Petitioner to adhere to his plea deal.

Rader acknowledged during his PCR testimony that it had been Hachler's and Gokey's wish that he "let Mr. Coon know that he was on the right track by making the plea," and that the attorneys had been adamant in their position. Respondent's Exhibit 213, p.

---

[5] Petitioner testified during his PCR proceedings that he would "never" have accepted a sentence of life in prison with only the possibility of parole and lifetime supervision. Respondent's Exhibit 214, p. 88.

141. While Rader was aware of this expectation, he nevertheless viewed his role as someone to provide Petitioner with "a fair and honest opinion what I thought his case was like and whether he's making the right decision." Respondent's Exhibit 214, p. 2. He viewed this as his sole involvement with the case, and "never thought that I would be standing in court with him to enter the plea, nor did I think I would be doing the trial later on if he withdrew his plea." *Id* at 3.

Rader spent two or three days reviewing the discovery with his investigator and discussed the case with Petitioner who thought "he could go to trial and his defense would be absolutely perfect." *Id* at 18. Rader saw no chance of this and told Petitioner that his proposed defense would not only fail, but might "irritate[] the jury if he got up and said some of the things he things that he wanted to say." *Id* at 19. Rader advised him of the consequences he faced to told him, "I think you're in real danger" and Petitioner ultimately decided that he did not wish to withdraw the plea. *Id* at 20-21. In light of this record, the PCR court's factual finding that Rader provided independent counsel is not an unreasonable determination of the facts in light of the evidence.

For all of these reasons, the PCR court's decision to deny Petitioner's Ground One ineffective assistance of counsel claims individually and collectively did not involve an unreasonable determination of the facts, nor did it involve an unreasonable application of clearly established federal law.

///

## 2. Ground Seven: Actual Innocence

As Ground Seven, Petitioner raises a freestanding claim of actual innocence based upon his allegation that an independent forensic pathologist would opine that the Medical Examiner's post-mortem report shows that it was at least as likely the victim suffered an asthma attack as died from smothering. In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court addressed the process by which state prisoners may prove "actual innocence" so as to excuse a procedural default. The Court explained that in order to be credible, a claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." *Id.* at 324; *Downs v. Hoyt*, 232 F.3d 1031, 1040 (9th Cir. 2000), *cert. denied*, 121 S.Ct. 1665 (2001). Ultimately, petitioner must prove that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327; *Bousley v. United States*, 523 U.S. 614, 623 (1998); *Downs*, 232 F.3d at 1040.

Assuming Petitioner could present expert forensic testimony that, based upon the Medical Examiner's report, the victim's cause of death was at least as likely an asthma attack as smothering, this would fall short of establishing that no reasonable juror would have voted to convict him. This is especially true given Petitioner's numerous inculpatory actions and statements leading up to and following the victim's death.

Where Petitioner cannot meet the *Schlup* standard to excuse a procedural default, he cannot meet the even more stringent standard applicable to freestanding claims of actual innocence. *See House v. Bell*, 547 U.S. 518, 555 (2006).

## C. **Request for Evidentiary Hearing**

Finally, Petitioner asks the Court to conduct an evidentiary hearing in this case. Where the record in this case is sufficiently developed to resolve the issues before the Court, Petitioner's request for an evidentiary hearing is denied. *See Rhoades v. Henry*, 638 F.3d 1027, 1041 (9th Cir. 2011).

### CONCLUSION

For the reasons identified above, the Corrected Amended Petition for Writ of Habeas Corpus (#47) is denied. The Court declines to issue a Certificate of Appealability on the basis that Petitioner has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this ⎽⎽11⎽⎽ day of March, 2019.

⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽
Michael W. Mosman
United States District Judge